# In the United States Court of Federal Claims

No. 01-351C
(Filed April 28, 2006)

*************************************

| | | |
|---|---|---|
| CLEARWATER CONSTRUCTORS, INC., | * | Government contracts; Contract |
| (a Division of Hensel Phelps | * | Disputes Act; summary judg- |
| Construction Co.), | * | ment; factual issues as to struc- |
| Plaintiff, | * | tural engineering calculations |
| | * | and meanings; latent/patent |
| v. | * | defects in specifications and |
| | * | design; delay; administrative |
| THE UNITED STATES, | * | effort to resolve questions of |
| Defendant. | * | contract interpretation. |

*************************************

*Joseph A. Camardo, Jr.*, Auburn, New York, for the plaintiff.

*J. Reid Prouty,* Department of Justice, Washington D.C., with whom were Assistant Attorney General *Peter D. Keisler*, *David M. Cohen*, Director, and *James M. Kinsella*, Deputy Director, for defendant.

## OPINION and ORDER

**Merow**, *Senior Judge*.

### INTRODUCTION

This contract dispute action is before the court upon defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment, both brought pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC").

### BACKGROUND

*Facts and Procedural History*

On February 20, 1986, Clearwater Constructors, Inc. ("Clearwater") and the United States Army Corps of Engineers ("the Corps") entered into Contract No.

DACA45-86-C-0068 ("contract") in the amount of $17,487,000 for the construction of a "Three Bay Hangar" for B-1B bombers at Grand Forks Air Force Base, North Dakota. (DPFUF[1] ¶ 1; PPFUF ¶¶ 1-2.) The firm fixed-price contract was awarded as a result of a bid submitted by Clearwater in response to Solicitation No. DACA45-B-0013, dated November 14, 1986. (PPFUF ¶ 1.)

On March 19, 1986, Clearwater subcontracted the fabrication and erection of the steel horizontal rolling hangar doors for the three hangar bays being constructed to Fleming Steel Company, Inc. ("Fleming"). (PPFUF ¶ 3; DPFUF ¶ 2.) Each of the three bay openings was to have a set of two doors with each door having four sections or "leaves." Six 31'-5" doors, each with four leaves, were required, for a total of twenty-four leaves. (PPFUF ¶¶ 3, 6.) The contract included Corps-supplied drawings and specifications. (*Id.*)

Fleming's subcontract was in the amount of $404,000 and included a 575 calendar day schedule. (PPFUF ¶ 4.) That subcontract incorporated the terms and conditions of Clearwater's contract with the Corps by reference. (*Id.*) The final completion date was October 6, 1987, and work was substantially complete by this date. (DPFUF ¶ 1.)

On March 14, 1996, pursuant to a liquidation and indemnification agreement, Clearwater submitted a claim with the Contracting Officer on behalf of Fleming for equitable adjustments totaling $1,171,422.07. (PPFUF ¶ 3.)

Clearwater claims additional compensation for: (1) constructive changes to the required wind load of the doors and the rail weight; (2) several other defective specifications and/or constructive changes; (3) breach of the duty to cooperate and not to hinder performance including unreasonably rejecting submittals; and (4) delays caused by the government.

Defendant moves for summary judgment asserting: (1) there were no constructive changes; (2) specifications were not defective; (3) the government is not liable for any difficulties plaintiff may have had in obtaining specialty steel from its

---

[1] Defendant's Proposed Finding[s] of Uncontroverted Facts ("DPFUF") and Plaintiff's Proposed Findings of Uncontroverted Fact ("PPFUF").

subcontractor; and (4) the Contracting Officer's decisions were not unreasonable. Clearwater's cross-motion seeks recovery on its claims.

**DISCUSSION**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986). Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court must resolve all reasonable inferences in favor of the nonmoving party. *Id.* at 255. The burden on the moving party is to demonstrate that there is no genuine issue of material fact, and may be discharged upon a showing "that there is an absence of evidence to support the nonmoving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex,* 106 S.Ct. at 2554). The burden then shifts to the nonmoving party to produce evidence setting forth specific facts of a genuine issue for trial. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249-50, 256; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc*., 739 F.2d 624, 627 (Fed. Cir. 1984) (holding that the nonmovant "must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial."). To create "a genuine issue of fact, the nonmovant must do more than present some evidence on an issue it asserts is disputed." *Avia Group Int'l v. L.A. Gear Cal., Inc*., 853 F.2d 1557, 1560 (Fed. Cir. 1988).

**1. Constructive Changes – wind load and rail size**

Clearwater alleges that the Corps constructively changed the contract specifications by requiring the hangar doors be designed to withstand a 40 pounds per square foot wind load, and the bottom rail be constructed with 60 pounds per yard rail.

"'A constructive change generally arises where the Government, without more, expressly or impliedly orders the contractor to perform work that is not specified in

the contract documents.'" *Conner Bros. Const. Co., Inc. v. United States*, 65 Fed. Cl. 657, 679 (2005) (citing *Lathan Co. v. United States*, 20 Cl. Ct 122, 128 (1990)). A contractor is entitled to additional compensation, an equitable adjustment in the contract price, for constructive changes. "To identify a constructive change, this court consults the contract language." *Aydin Corp. v. Widnall*, 61 F.3d 1571, 1577 (Fed. Cir.1995). Contract interpretation presents an issue of law. *Id.*; *Rutgers v. United States*, 41 Fed. Cl. 764, 769 (1998).

### A. Wind load

On or about May 12, 1986, Fleming submitted its design for the hangar doors, using a 30 pounds per square foot ("psf") wind load. (PPFUF ¶ 9.) On June 9, 1986, in a telephone conference, the Corps stated 40 psf was the standard for the hangar doors. (PPFUF ¶ 10.) According to the Affidavit of Seth Kohn, Fleming's President, 40 psf equates to a wind greater than 100 miles per hour. (Kohn Aff. ¶ 12.) On July 1, 1986, the Corps rejected Fleming's interpretation and reiterated its position that the doors be able to withstand a maximum wind load of 40 psf. (DPFUF ¶ 10; PPFUF ¶¶ 10, 15.) Fleming acquiesced under protest. (PPFUF ¶ 16.)

Several contract provisions are cited by the parties for their respective positions on the wind load standard. Both parties contend the contract is capable of only one interpretation, but this does not appear to be the case.

The contract has several sections specifically addressing hangar door wind loads. Section 3.2.2, titled "Design Loads" provides: "[d]oors and collateral work shall be designed for the wind loads indicated herein and for all dead and live loads." (PPFUF, Exh. at 4; DPFUF, App. at 12.)

According to defendant, the foregoing is clear–hangar doors must comply with indicated wind loads, and that specification is on a chart labeled "Wall Wind Loads" on Sheet S-44 of the contract, which plainly requires a 40 psf design requirement. That chart lists the following:

**ALL WIND LOADS**

| ELEMENT | LOW BLDG | TAIL BLDG |
|---|---|---|
| Girt (pressure) | 28 PSF | 32 PSF |
| Girt (suction) | 40 " | 45 " |
| Exterior Siding (suction) | 37 " | 42 " |
| Interior (pressure) | 15 " | 18 " |

(DPFUF, App. at 17.)

Defendant states that although the calculations are not in the specifications, using American National Standards Institute ("ANSI") 58.1-1982 and wind speed and exposures in the contract, the Corps' calculated negative pressure (suction) ranging from 36 psf for areas greater that 500 square feet to 44 psf for areas less than 10 square feet. Accordingly, 40 psf for the "Girt (suction)" for the low building falls right in the middle of those parameters, which further supports its position, the government states. Conversely, the 30 psf suggested by Clearwater falls outside those parameters.

While defendant may be able to establish through testimony or further exposition on structural mechanics that "Girt (suction)" unquestionably applies to these doors, and that the doors are on a "low" building, on this record it cannot be said there is no material factual issue in this regard.

Secondly, both parties agree that the following "Designer Notes" on Sheet S-44[2] also contains structural design criterion applicable to the wind load requirement on these doors. The structural design was prepared using the following data:

---

[2] Parts of the documents provided by the parties in this regard are hard to read and almost illegible in places, which makes it difficult to determine whether the context of this language is of a mandatory design criteria or merely an example of a design using this particular data. Regardless, however, the language cited by both parties fails to compel the conclusion either party here seeks.

   4.  WIND LOAD:

     A.  BASIC WIND SPEED = 80 MPH ANSI A581-82.
     B.  DESIGN EXPOSURE = "C"
     C.  CATEGORY III: I = 1.07
     D.  SEE S-44 FOR ROOF UPLIFT PRESSURES
     E.  SEE S-44 FOR WALL PRESSURES
     F.  MAIN RESISTING SYSTEMS:
      (1) 0-30 FT. = 30 PSF
      (2) 30-70 FT. = 35 PSF

(DPFUF App. at 17.)

  Furthermore, both parties have cited part F - "Main Resisting Systems" as requiring 35 psf if the system is 30 to 70 feet high. The hangar doors in question are 31 feet high. Clearwater states that the doors are part of the main resisting system, and under the foregoing specifications, are classified as requiring a 35 psf standard. Defendant says the doors are not a part of the main resisting system; rather, they are "secondary members and cladding."

  According to the ANSI standard 58.1-1982, the definition of "Main Resisting System," is "an assembly of major structure elements assigned to provide support for secondary members and cladding. The system primarily receives wind loads from relatively remote locations. Examples include rigid and braced frames, space trusses, roof and floor diaphragms, sheer walls and rod-braced frames." (DPFUP ¶ 6.) Plaintiff adds that ANSI 58.1-1982, ¶ 6.2 provides specific examples of "components and cladding," which do not include hangar doors. The examples given are "curtain walls, exterior glass windows and panels, roof sheathing, purlins, girts, studs, and roof trusses." (DPFUP, App. at 44-45.)

  It is not intuitively obvious on this record whether the hangar doors fall under either the "main resisting system" or the "cladding" definitions.[3] The court cannot

---

[3] The Contracting Officer's decision dated June 15, 2000 concluded the hangar doors were not part of the main resisting systems. "For the Three-Bay Hangar, the main resisting system would be the trusses. The hangar doors would be considered 'components and cladding.'" (DPFUF, App. at 3.) However, this conclusion provides no basis for summary adjudication as proceedings in this matter must be addressed *de novo*. *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (*en*
                                       (continued...)

make structural characterizations of this nature for a B-1 bomber hangar at Grand Forks AFB, North Dakota.  Whether the hangar doors are in any instance, or in this situation specifically, a "Main Resisting System;" and conversely, whether they are secondary members or cladding supported by the main resisting system cannot be determined summarily.

Both parties also cite structural load calculations using Sheet S-44 and ANSI A58.1-1982, with plaintiff concluding the result produced was 23.5 psf.  The accuracy of this calculation is evidenced by a duplicate project under construction at the same Air Force base where the same wind loading specification and values were submitted and approved by the Corps, Clearwater adds.

Defendant argues that Clearwater's calculations find no support in the ANSI standards; rather the 40 psf requirement is consistent with calculations in accordance with ANSI A58.1-1982.  Moreover, the government points out that 40 psf was Fleming's initial view of the contract requirements.

Additionally, the court notes that defendant's calculations, which were submitted through the Declaration of Bruce Harris, are "not the same as values calculated in support of the Contracting Officers Decision in this case (within 5 to 10%), since the mean roof height was approximated . . . ." (DPFUF, App. at 45.)  Thus, on this record, the court can not make a factual determination as to the accuracy of each parties' calculations.

Calculations, definitions, and interpretations regarding Sheet S-44 and ANSI A58.1-1982 are in dispute.

The government contends the following is a structural design criteria of 40 psf for the horizontal rolling doors.  Plaintiff counters that this paragraph describes the operating capabilities of the motors to open and close the hangar doors, not the design loads.  Recalling that the contract provisions cited above are in the "Structural Design" section, paragraph 3.1 titled "Operation," governs the opening, closing, and maximum operating speed of the doors.

---

[3]/(...continued)
*banc*) (citing 41 U.S.C. § 609).  *See also England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 851-54 (Fed. Cir. 2004).

  3.1.1 <u>Opening</u>.  Each set of hangar doors shall be capable of being fully opened, under any wind load condition up to and including the maximum design wind load condition of 45 pounds per square foot for tail doors and 40 pounds per square foot for horizontal rolling doors, from the closed position by electric power within 2-1/2 minutes from the time that the controls are initially activated . . . .

  3.1.2. <u>Closing.</u>  Each set of hangar doors shall be capable of being fully closed by electric power within 2-1/2 minutes from the time that the controls are initially activated.

  3.1.3. <u>Movement Speeds.</u>  Maximum operating speed for any leaf of the horizontal rolling doors shall be 60 feet per minute for any wind load condition up to and including the maximum design wind load condition specified herein. . . .

(PPFUF, Exh. 1 at 4; DPFUF, App. at 12, 13.)

  This specification appears to be one of performance, not design but it is not clear what would happen to a door designed for a 30 psf wind load which is subjected to a 40 psf load.  Would the door still operate because the opening and closing is designed for 40 psf?  Design specifications "set forth in precise detail the materials to be employed and the manner in which the work . . . [is] to be performed."  *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 689, 412 F.2d 1360, 1362 (1969).  By contrast, performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection."  *Id*.  The doors have to open within 2 ½ minutes under any wind conditions up to the "maximum design wind load" of 40 psf for the horizontal rolling doors.  While the defendant's argument may prevail, in that the quoted language confirms other such specifications, neither parties' reliance on this language compels favorable summary adjudication.

  In addition to the foregoing, the court notes that the structural requirements of the contract are detailed and technical.  It is simply not immediately apparent how wind load might be parsed or affected by the other specification parameters noted hereinafter.  Paragraph 3.2 "Structural Design" requires "all structural components

of doors and collateral work" be designed in accordance with "referenced AISC publications," and:

> Metal covering for the doors shall be designed in accordance with AISI [American Iron and Steel Institute] publication Specification For the Design of Cold-Formed Steel Structural Members. Each horizontal rolling door leaf acting as a unit and all components of the leaf shall be designed to resist all wind and seismic loads indicated or specified. The maximum deflection of the door leaves shall not exceed the height of the door divided by 240. The doors shall be designed so they will not flutter more than plus or minus 1/4 inch from the vertical position at the top of the horizontal rolling doors. The tail door shall be designed in accordance with the above paragraph except the maximum deflection shall not exceed the length in the direction of span of door divided by 240. Door coverings shall be designed to deflect not more than the span between supporting members divided by 240. No permanent set (yielding) will be allowed.

(PPFUF, Exh. 1 at 5.)

The question is whether the above flutter and deflection standards may or may not impact wind load design criterion.

In partial summary, the four corners of the contract here do not inextricably lead to the conclusion advocated by either party. Further evidentiary development is required to explain the specifications in the contract. *Lathan Co. Inc. v. United States*, 20 Cl. Ct. 122, 126, 128 (1990). To the extent there are inconsistencies or ambiguities, parole evidence (which may or may not include other similar contract(s) involving similar structural load calculations, and/or Fleming's initial pre-bid notes, possibilities the court is not addressing in this Opinion), may be appropriate.

### **B. 60 Pound rail**

The government required 60 pound rail be used as a component of the hangar doors. (While not necessary to the determinations herein, apparently, this contested specification concerns the strength or weight of the rail upon which the hangar door rollers traverse when the doors are opened and closed.)

Mr. Seth Kohn, Vice President for Fleming, while performing his estimate wrote that the "specs call for 60 # rail." (DPFUF ¶ 12.) But, later, in letters dated March 31, May 14, and July 1, 1996, Fleming provided calculations to the Corps stating that the 30 pound rail was appropriate under the contract. (PPFUF ¶ 31.) The Corps refused to allow the use of the 30 pound per yard rail and insisted on 60 pound rail which impacted the size of the wheel rolling on the rail and the wheel housing. The wheels had to be increased to accommodate the 60 pound rail. (PPFUF ¶¶ 29, 31, 32.)

Clearwater contends 60 pound rail was not required and seeks the additional cost in providing the wheel modifications required, reading two sections of the contract in conjunction with each other. Citing the following, Clearwater argues it (Fleming) had the discretion to determine the proper rail size for the hangar doors so long as the selected rail met ASCE requirements.

> 2.6.2. <u>Tolerances for Bottom Rail.</u>  Rails shall be standard ASCE or AREA rail weighing not less than 60 pounds per yard.

(PPFUF, Exh. 1 at 4.)

Plaintiff contends that paragraph 2.6.2 allows plaintiff to use either one of two types of rail, (1) ASCE rail; or (2) AREA rail weighing not less than 60 pounds per yard. (*Id.*)  This reading is further supported by section "2. SCOPE OF WORK" which paragraph 2.6.2 falls within:

> [u]nless otherwise indicated, this section of the specifications covers the design, fabrication, and installation of the hangar doors in every respect, including all necessary collateral work. . . . The hangar doors shall consist of the following assemblies and components[.]

(*Id.* at 3.)

Plaintiff's construction of this particular language is forced. The words ASCE and AREA are adjectives modifying the word "rail." The phrase "weighing not less than 60 pounds per yard" also modifies the word "rail." Under paragraph 2.6.2, rails could either be standard ASCE rail weighing not less than 60 pounds per yard, or

AREA rail weighing not less than 60 pounds per yard. Accordingly, defendant appears to have the better argument here.

However, plaintiff also points to paragraph 8.1 (cited below) which specifies the use of ASCE rail of the size and weight needed. Thus, plaintiff argues it had the option to use ASCE rail and was therefore allowed to determine the proper size and weight needed. The government says this section applies only to "Collateral Work" not previously specified. And, the government is correct, to a point. Section 8, "Collateral Work," provides in pertinent part:

> **[a]ll additional work which is not specified elsewhere** but is necessary for the complete operation, maintenance and safety of the hangar door system, including but not necessarily limited to, the following components.

Paragraph 8.1 is, however, specific:

> 8.1 <u>RAILS AND GUIDES FOR HORIZONTAL ROLLING DOORS</u>. . . . Bottom rails shall be **A.S.C.E. rails of the size and weight as needed**.

(*Id.* at 21, emphases added.)

Interaction between these two perhaps inconsistent specifications here precludes summary judgment on this point. *Lathan Co. Inc. v. United States*, 20 Cl. Ct. 122, 126, 128 (1990). In this regard, Fleming's initial inclusion of 60 pound rail in its bidding estimates will be considered.

**2. Defective Specifications**

Clearwater contends that it is entitled to equitable adjustment because of defendant's defective specifications relating to: (1) Top Guide Rollers; (2) Rail Head; (3) Safety Edges and Reset Procedure; and (4) Pedestrian Doors.

Whenever the government uses specifications in a contract, there is an accompanying implied warranty that these specifications are free from errors. *United States v. Spearin*, 248 U.S. 132, 137 (1981) (permitting a contractor to rely on an

implied warranty by the government). It is well-established that contractors may be entitled to an equitable adjustment for increased costs of performance due to defective specifications. *L.W. Foster Sportswear Co. v. United States*, 186 Ct. Cl. 499 (1969). Defective specifications must, however, mislead the contractor. *Robins Maintenance, Inc. v. United States*, 265 F.3d 1254, 1257 (Fed. Cir. 2001). Plaintiff is not entitled to recover when it was aware of a defect in the specification at the time of entering into a contract. *Id.* at 1258; *see also E.L. Hamm & Assoc. v. England,* 379 F.3d 1334 (Fed. Cir. 2004); *Wickham Contracting Co., Inc. v. United States*, 212 Ct. Cl. 318, 546 F.2d 395, 401 (1976). Additionally, plaintiff is only entitled to an equitable adjustment if it can show that its conduct in preparing its bid was reasonable. *E.L. Hamm & Assoc.*, 379 F.3d at 1339; *see also Highway Prods., Inc. v. United States*, 207 Ct. Cl. 926, 530 F.2d 911, 919 (1976). If the defect was "patent," in that it was obvious, gross, or glaring, plaintiff had a duty to inquire about the defect from the start and obtain a clarification. *NVT Tech. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004); *Cmty. Heating & Plumbing Co. Inc. v. Kelso*, 987 F.2d 1575, 1580 (Fed. Cir. 1993).

As to plaintiff's defective specifications claims, genuine issues of fact are present that preclude summary judgment.

### A.  Top guide rollers

The parties also dispute the contract's requirements concerning top roller guides. Section 8C, paragraph 6.3 states: "each door leaf shall be provided with a minimum of four top guide roller carriage assemblies at a maximum spacing of 6'-0" center to center." (PPFUF ¶ 18; DPFUF ¶ 16.)

On May 12, 1986, Fleming made its initial Door Design submittal to the Corps, which indicated the use of two top guide rollers per leaf. (PPFUF ¶ 20.) The Corps' position was that four top guide rollers per leaf were necessary. (PPFUF ¶ 21.) The Corps eventually conceded that it was impossible for Fleming to comply with the contract specifications here. (PPFUF ¶ 22.) For the two center leaves, the top guides could not run into the location where the tail door would close. (*Id*.) The two center leaves had to be cantilevered past the end of the top guides. (*Id*.) If Fleming designed the top roller system as specified, two of the four top rollers on each center leaf would not be engaged in the top guide system when the doors were in the closed position because there were no top guides below the tail door. (*Id*.)

After sundry communications, the government conceded that two top roller guides would suffice for the two center leaves; however, Fleming incurred delays, increased design and other costs as a result of what plaintiff calls an admitted design defect.  The government counters that Fleming was not mislead by any flaws but recognized the error from the onset and was able to proceed with the center doors exactly as intended.  Accordingly, any delay is attributable to Fleming's failure to bring this obvious flaw to the government's attention.  The Contracting Officer's decision concluded: "it is reasonable to expect an experienced manufacturer/installer of such doors to understand this." (DPFUF, App. at 4.)

Defendant submits an affidavit of Polina Poluektova to support its assertion that this flaw was not brought to the government's attention. However, as Clearwater points out, her affidavit is based on her "belief" that no such defect was brought to the government's attention based on her review of the file.  She had no direct involvement with the contract or negotiations.

On the other hand, Fleming President Seth Kohn's Affidavit sets out his general practice of informing of contract defects.  Mr. Kohn's Affidavit speaks in generalities and is not specific that objection was made to the top roller guide design defects.

What appears clear is that the government conceded at least in part, agreeing to delete some of the roller guide requirements.  ("[W]e have conceded that the contract requirements of four wheels were impossible for these leaves."). (Def.'s Opp'n at 11.)  How this evolved, whether any defect is latent or patent, whether plaintiff was misled, and whether or not the government was informed, are all factual disputes that prevent granting summary judgment.

### B.  Safety edges and reset mechanism

Safety edges automatically stop door operation upon encountering an obstacle.

Section 8C, paragraph 6.10.1 provides for a double run of safety edges–one on the leading, and one on the trailing edge of the door in each four-leaf group:

> Pneumatic Safety Edges.  Leading and trailing edges of each door in each four-leaf group shall be provided with a double run of safety

> edges from 2 inches above the floor to the top of the door leaf. They shall be mounted at the corners and be properly spaced to provided the maximum degree of safety in stopping the group. The safety edges shall be designed to provide the necessary amount of overtravel after actuation before solenoid resistance is met. Only the safety edges on the edge of the group in the direction of travel shall stop the door movement in that direction. Safety edges shall not be used as limit switches.

(DPFUF, App. at 14.)

Clearwater explains that safety edges on the lead and trailing edges of individually motor operated doors operate independently and thus require this bilateral safety measure. However, these doors, although consisting of four leaves, operated as a single unit with one fixed path of travel via a cable system. If safety edges were installed on all leaves in a group, the brackets for the cable system would interfere with the safety edges. (Pl.'s Mot. at 10.) Fleming's initial design submittal included safety edges on the lead and trailing edge of the door as a unit, not on each individual horizontal leave–which is asserted was the proper arrangement for a group-operated door system, as was done in the other hangar project on the same base. Fleming further noted that if it were required to install safety edges on all of the leaves, the edges would have to be discontinuous so as to accommodate the cable systems which linked the leaves together which would violate Section 8C, paragraph 6.10.1 of the contract which required continuous edges. (*Id*.) With respect to the reset button configuration, Fleming noted that the specifications called for a system that was unsafe, and that Fleming's proposed configuration would alleviate the safety issue. (PPFUF ¶ 47.)

The Corps objected to the safety edge design and the reset procedure. Clearwater alleges the Corps did not understand Fleming's concerns. However, after further discussion and a meeting in August 1986, resolution was reached and the Corps agreed to changes. Clearwater seeks additional costs associated with the time and effort and cost required to convince the Corps to make these required changes.

These design inconsistencies were obvious and should have been brought to the government's attention prior to the contract award, the government defends. ("[B]ecause the alleged deficiencies were an 'obvious inconsistency of consequence,' Fleming cannot seek damages as a result of them when it made no effort to bring the

inconsistency to the attention of the Corps prior to the bid." (Def.'s Opp'n at 12.) (citing *E.L. Hamm & Assoc., Inc. v. United States*, 379 F.3d 1334, 1339 (Fed. Cir. 2004.))

As with other issues herein, factual matters concerning the latent or patent nature of the defect(s) cited here, counsel against granting summary judgment on this issue. *E.L. Hamm & Assoc.*, 379 F.3d at 1338 (stating that question of whether or not a contractor was misled by defective specifications is one of fact).

### C. Yard rail size and rail head

The contract drawings, Sheet S-53, Detail E, show the rail head to be 3/4 inch above the finished floor surface. (DPFUF ¶ 14.) Fleming explained that the rail head should have been flush with the finished floor surface which was/is the industry standard because having a rail head 3/4 inch above the floor would create serious problems such as people tripping over the exposed rail and damage to aircraft rolling over it. (PPFUF ¶ 33.) Fleming's first design submittal demonstrated the rail head to be flush with the finished floor surface. (DPFUF ¶ 15.) The Corps required that the design be in accordance with the specifications, and Fleming made a second conforming submission and seeks the costs of doing so.

The government says that its design for a rail head to be other than flush with the hangar floor was within its right. If Fleming designed what it felt was a better product, it did so at its peril. (Def.'s Mot. at 9.) (citing *Rixon Elec., Inc. v. United States*, 536 F.2d 1345, 1351, 210 Ct. Cl. 309, 320 (1976) ("You can engage a contractor to make snowmen in August, if you spell it out clearly.")). "Clearwater has no basis for its claim of a design defect which would have mislead it: Clearwater's insistence that Fleming knew better than the Corps what the Corps wanted was a case of Clearwater misleading itself." (Def.'s Opp'n at 10.) Accordingly, defendant asserts that any redesign by Fleming was not authorized and, as a matter of law, no additional compensation is due.

Clearwater disagrees with, but does not dispute that the contract required a rail head 3/4 inch above the floor surface. Indeed the record contains Fleming's letter strongly recommending a design change. (DPFUF, App. at 19.) ("We strongly recommend that the bottom rails for this project also be flush with the finished floor surface."). Nevertheless, Fleming unilaterally redesigned the rail head to be flush

with the floor. The Corps insisted on the original design as provided in the contract and was within its rights to do so. (DPFUF ¶¶ 14, 15 and Pl.'s Resp.) The government is entitled to summary judgment on this point.

### D.  Location of the pedestrian doors

Defendant explains that the location of the pedestrian doors was only described generally in the contract. Although initially rejecting Fleming's proposed location, upon further review and discussion with Fleming, the Corps agreed to Fleming's design. Fleming alleges the design should have been more detailed and if the design had been better detailed, these discussion would not have been necessary. Additional costs are sought for time and effort in discussions in this regard.

While it appears the government may have the better argument here that the lack of detail on pedestrian doors should have been apparent and vented prior to the bid, genuine issues of material fact preclude summary determination with respect to this claim.

### E.  Difficulty in obtaining specialty steel

There were difficulties in obtaining certain specialty steel from a subcontractor (AFCO), and, as a result, Clearwater directed Fleming to redesign a portion of the doors. It is the government's position that this redesign was not requested by the Corps, but was prompted by and benefitted only AFCO and was necessitated by AFCO's failure to obtain the specialty steel.

Clearwater counters that its claim here is not only based on the unexpected unavailability of speciality steel, but also on the government's redesign of the top guide system.

On or about May 9, 1986, Clearwater asked Fleming to design the hangar doors using MC6 x. 15.3 as top guide material rather than the MC7x19.1 mentioned in the specifications. (PPFUF ¶ 52.) On or about May 12, 1986, Fleming made its first submittal for the hangar doors, where it requested verification of the top guide material change. (*Id*. ¶ 53.)

On or about August 1, 1986, Clearwater informed Fleming that the Corps was considering changing soffit and door widths. (PPFUF ¶ 54.) At this point in time, the top guide system was not fully designed because of revisions and additions of loads by the Corps architect/engineer. (*Id.*) Fleming requested that it be provided with details of the changes. (*Id.*)

On or about August 5, 1986, Clearwater informed Fleming that a modification to the contract by the Corps was forthcoming regarding a redesign of the top guide system. (PPFUF ¶ 55.) In addition, Clearwater advised Fleming that AFCO, the structural steel subcontractor, was in the process of revising the soffit framing around the head of the doors. (*Id.*)

At the August 12, 1986 meeting in Omaha, Fleming requested the final redesign for the top guides system. (PPFUF ¶ 56.) On August 14, 1986, AFCO contacted Fleming to discuss the top guide system and stated that the design had not been submitted for approval. (PPFUF ¶ 57.)

On or about August 28, 1986, Fleming forwarded a letter to Clearwater in which it clarified the changes made in its third Hangar Door submittal. (PPFUF ¶ 58.) In this letter, Fleming requested that it be provided with the final top guide system drawings. (*Id.*) Thereafter, on or about September 9, 1986, the Corps architect/engineer changed the live load roof movement from 8 inches to 4 inches. (PPFUF ¶ 59.) Additionally, at this time, the top guide system drawings were being submitted for approval. (*Id.*) On September 16, 1986, Fleming claims to have received the details for the top guide system. (PPFUF ¶ 60.)

There are factual issues concerning whether and how any changes to the top guide system impacted Clearwater's claims here.

### F.  Claims of contract administration delay

These claims relate to delays, or time taken up in discussions about requested changes. The government characterizes Clearwater's claim here as premised on the notion that the Corps' failure to immediately agree to Fleming's change requests equates to an actionable delay. Factual issues preclude summary adjudication.

### G. Braking system/motor operation

Defendant claims that Clearwater is attempting to obtain payment for a design of a door braking system it (Fleming) alleges is better than the one called for in the contract.

Section 8C of the contract, "Hangar doors," cited earlier, specifies how fast the hangar doors must open under certain wind conditions.

> 3.1.1. <u>Opening</u>.  Each set of hangar doors shall be capable of being fully opened, under any wind load condition up to and including the maximum design wind load condition of 45 pounds per square foot for tail doors and 40 pounds per square foot for the horizontal rolling doors, from the closed position by electric power within 2-1/2 minutes from the time that the controls are initially activated. . . .
>
> 3.1.2. <u>Closing</u>.  Each set of hangar doors shall be capable of being fully closed by electric power within 2-1/2 minutes from the time that the controls are initially activated.
>
> 3.1.3. <u>Movement Speeds</u>. Maximum operating speed for any leaf of the horizontal rolling doors shall be 60 feet per minute for any wind load condition up to and including the maximum design wind load condition specified herein . . . .

(PPFUF, Exh. 1 at 4; DPFUF, App. at 12-13.)

Fleming calculated that given the size and composition of these hangar doors, to fully open or close within the time constraints, a motor speed of at least 41 feet per minute was necessary.  The speed of Fleming's motor was rated at 53.6 feet per minute which more than satisfied the contract specifications.

The Corps questioned Fleming's submittal in this regard.  Following discussions, including Fleming's explanation that the same motor-operator combination design had been accepted in a hangar being installed next door, the Corps ultimately accepted the design.

The Corps also said the 53.6 feet per minute at zero wind load design was too slow, asserting the specification was for 60 feet per minute. Fleming argued, finally successfully, that the 60 feet per minute specification in the contract was a maximum, not minium speed.

As with the delays addressed immediately hereafter, factual issues preclude summary adjudication.

### H.  Delay and other claims

Plaintiff also seeks compensation for delays, time spent in clarifying where pedestrian doors were to be located, administrative, and travel costs for clarifying meetings due to defective specifications, and costs associated with inability to obtain specialty steel.

In seeking to prove the government's liability for a delay, plaintiff has the burden of proving "the extent of the alleged delay, the causal link between the government's wrongful acts and the delay in the contractor's performance, and the alleged harm to the contractor for the delay. *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1316 (Fed. Cir.2000); *see also Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1295 (Fed. Cir.2000). In establishing the causal link, plaintiff must show that the government's actions affected activities on the critical path of the contractor's performance of the contract." *Kinetic Builder's Inc.,* 226 F.3d at 1317. Plaintiff generally, "cannot recover for concurrent delays for the simple reason that no causal link can be shown: A government act that delays part of the contract performance does not delay 'the general progress of the work' when the 'prosecution of the work as a whole' would have been delayed regardless of the government's act. *Essex Electro Eng'rs, Inc.*, 224 F.3d at 1295.

As to plaintiff's delay claim based on the unavailability of the specified steel, a genuine dispute does not preclude entry of summary judgment. Plaintiff does not allege the unavailability of the steel was caused by the government. Defendant is not liable for the unavailability of the specified steel. As defendant correctly states, the obligation to procure required materials lies directly with the contractor. *Franklin E. Penny v. United States*, 207 Ct. Cl. 842, 524 F.2d 668 (1975) ("obligation to locate a supplier remains where that sort of obligation has traditionally rested – upon the

contractor"). However, plaintiff also asserts the unavailability was beyond its control and beyond the control of Fleming.

However, plaintiff's claim based upon the alleged delay in the verification of the top guide material change caused by the unavailability of the specified steel, along with the alleged delay in providing the top guide drawings, involves factual issues that preclude the entry of summary judgment. In this regard, there is a genuine issue as to whether defendant actually caused some or all of the delays. Additionally, there are genuine issues of fact as to the extent of the delay and the harm of the delay. For example, is from May 22, 1986 to October 3, 1986, the time taken to approve Fleming's Hangar Door submittal unreasonable? Therefore, whether plaintiff can satisfy the burden of proving defendant's liability for delay cannot be determined summarily.

Likewise, plaintiff's claims for alleged delays by the Corps in agreeing to some of the modifications herein, claims of breach of the duty to cooperate and not hinder, and the extent of what the government asserts were reasonable questions and follow-up inquiries concerning the matters in dispute here, are inextricably linked to the factual disputes previously noted, and summary determination is not warranted.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part. Plaintiff's Cross-Motion for Summary Judgment is **DENIED.**

Counsel shall confer, and, on or before May 25, 2006, file a joint status report with a proposed schedule for further proceedings to resolve remaining issues.

s/ James F. Merow  
James F. Merow  
Senior Judge